IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID J. MARSHALL,

                              Plaintiff,                         OPINION AND ORDER

        v.                                                            23-cv-176-wmc

RADU FILIPESCU, JAMIE BARKER,
and CHRIS BUESGEN,

                              Defendants.

In this civil case, plaintiff David Marshall is representing himself and proceeding on a claim under the Eighth Amendment for deliberate indifference, as well as a state law medical negligence claim, regarding his alleged failure to receive adequate medical care for hemorrhoids and anal fissure at a Wisconsin Department of Corrections ("DOC") facility in Stanley, Wisconsin.  Specifically, plaintiff claims that:  (1) DOC defendants Chris Buesgen, Stanley Correctional Institution's Warden, and Jamie Barker, its Health Services Manager, were responsible for a policy requiring inmate patients to be seen by a doctor before receiving any medical treatment, resulting in a month-long delay in plaintiff's receipt of medical treatment for pain; and (2) defendant Radu Filipescu, M.D., negligently prescribed him nitroglycerin ointment, to which he had a severe reaction.[1]  Several motions are now pending before the court.

_____

[1] Defendants properly removed this case from the Dane County Circuit Court on the basis of federal question jurisdiction under 28 U.S.C. §§ 1331, 1441(a).  (*See* dkt. #1.)  While plaintiff initially asserted federal constitutional and state negligence claims against all three defendants, this court dismissed his federal claim against defendant Filipescu at screening (dkt. #11, at 4-5), and later dismissed his state negligence claims against Buesgen and Barker because of plaintiff's failure to comply with the notice of claim statute (dkt. #73).

*First*, plaintiff has moved to dismiss the DOC defendants' motion for partial summary judgment for failure to exhaust administrative remedies on the ground that the court did not extend their deadline for filing such motions. (Dkt. #131.) However, defendants' exhaustion motion was filed on November 9, 2023 (dkt. #37), which was the deadline set in the preliminary pretrial conference order (dkt. #24, at 4). While the court later extended the state defendants' deadlines for expert witness disclosures and dispositive motions, pending the court's ruling on the exhaustion motion (dkt. ##69, 73, and 82), defendants also filed their motion for summary judgment on the merits by the new deadline (dkt. ##74 and 91). Accordingly, plaintiff's motion to dismiss for failure to meet the court's filing deadlines will be denied without further discussion.

*Second*, defendants Buesgen and Barker have filed a motion for summary judgment with respect to plaintiff's remaining claims against them.[2] (Dkt. #91.) Although the evidence shows that plaintiff reported pain for about a month before he saw a physician, plaintiff has failed to show that either defendant Buesgen or Barker were responsible for any policy that delayed his receipt of necessary medical treatment for his pain. In addition, an inmate is not entitled to the medical treatment of his choice, and the evidence shows that plaintiff received treatment for his hemorrhoids and pain while he was waiting to see a physician. Moreover, plaintiff has not offered evidence that his condition required either emergency or immediate treatment nor that some other treatment was the only reasonable treatment for his condition. Finally, defendants Buesgen and Barker are entitled to

---

[2] These defendants also filed a motion to correct their reply brief (dkt. #126), which will be granted and has been considered by the court.

qualified immunity. Accordingly, the court will grant Buesgen's and Barker's motion for summary judgment and dismiss the federal claims.

*Third*, defendant Filipescu has filed a separate motion for summary judgment regarding the Wisconsin medical negligence claim against him. (Dkt. #74.) Because the court has dismissed all of plaintiff's federal claims over which it has original jurisdiction, however, the court declines to exercise supplemental jurisdiction over that claim arising under Wisconsin law. Accordingly, the court will deny Filipescu's motion for summary judgment as moot and remand this remaining medical negligence claim to the Dane County Circuit Court for resolution.

*Fourth*, plaintiff filed three motions after the completion of summary judgment briefing: (1) a motion for "default judgment" related to defendants' alleged failure to respond to his requests for discovery (dkt. #128); (2) a motion to compel discovery about the nitroglycerin ointment prescribed by Dr. Filipescu (dkt. #141); and (3) a motion to amend his complaint to add more state law claims against Dr. Filipescu and new medical negligence claims against defendants Buesgen and Barker (dkt. #145). For the reasons also discussed below, the court concludes that there is no basis for default judgment or any similar sanction, and the court's dismissal of plaintiff's federal claims make further discovery related to Dr. Filipesacu's medication prescription unnecessary and any amendments to plaintiff's state law claims futile. Accordingly, these three motions will be denied.

*Fifth* and finally, plaintiff's renewed motion for court assistance in recruiting counsel to represent him at trial (dkt. #143) will be denied as moot.

UNDISPUTED FACTS[3]

**A. Background**

Plaintiff David Marshall is incarcerated at Stanley Correctional Institution, where defendants are all employed by the DOC.  Defendant Jamie Barker, a licensed nurse, has been Stanley's Health Services Manager ("HSM") since February 2014; defendant Christopher Buesgen has been its warden since September 2020; and defendant Radu Filipescu is a licensed, general practice physician.

HSM Barker's responsibilities include management and supervision of health care services; developing policies and procedures; monitoring care plans; preparing required reports; and providing liaison assistance to other disciplines, institution units, and community health care providers.  She also works collaboratively with Advanced Care Providers ("ACPs"), who include physicians, dentists, psychiatrists, Advanced Practice Nurse Prescribers ("APNPs"), and specialists serving as consultants to DOC's Bureau of Health Services ("BHS").  While Barker as the HSM provides administrative support and direction of the unit, the ACPs are responsible for the professional management of medical and dental services for inmate patients.  Because her position is administrative in nature,

---

[3] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidentiary record where appropriate, and viewed them and all reasonable inferences in a light most favorable to plaintiff.  *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) (At summary judgment, the court must "construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").  Because the court is dismissing plaintiff's state law claim against Dr. Filipescu, the court has included only those facts relevant to plaintiff's federal claims against Warden Buesgen and HSM Barker.

Barker does not have direct contact with inmate patients; nor does she evaluate, diagnose, or determine their course of treatment. Instead, medical care is provided by HSU nursing staff and ACPs. Barker and the other nurses working in HSU also do not have the authority to: prescribe medications for inmate patients; make referrals to, order or schedule appointments with, or control the schedules of onsite or offsite providers; or override the treatment decisions made by onsite or offsite providers.

As the Warden at Stanley, Buesgen is supervised by DOC's Administrator of the Division of Adult Institutions ("DAI") and serves as the chief executive officer at Stanley. He is responsible for the planning, operation, direction, and management of the institution. While Buesgen used to supervise the BHS medical staff at Stanley, including Barker, this changed in June 2024, when BHS took over supervision of all institution HSUs. However, even when he supervised medical staff, Buesgen was not a medical professional and did not have any medical expertise. As a result, when an inmate wrote to him regarding a medical concern, the inmate was directed to contact HSU or BHS. Buesgen did not have authority to create or change DAI policies or state statutes mandating the prescriptive authority of nursing professionals and has no direct knowledge of any inmate's specific medical treatment, including the plaintiff, Marshall. Nonetheless, Warden Buesgen is generally aware that nursing staff have limited prescriptive authority, and that ACPs are the providers responsible for the diagnosis, treatment, and ordering of prescriptions for inmate patients.

### B. Obtaining Medical Care at Stanley

When inmates enter Stanley, they are given an inmate handbook that informs them about how to access medical care. Inmates are also informed that if they need to see medical staff immediately, they should alert unit staff (i.e., correctional officers, sergeants, lieutenants, captains, and unit managers). Inmates with non-emergency medical needs are directed to submit a Health Services Request ("HSR") form to HSU. The HSRs are then triaged by HSU nursing staff, who utilize their clinical training and judgment to prioritize and address the patient's needs and determine the best course of treatment.

HSM Barker typically does not typically see HSRs unless nursing staff forward them to her to address a particular issue. When an HSR has been forwarded to Barker, the box "Refer HSR to" is checked with Barker's name listed next to it. Upon her review, the bottom section of the HSR also shows her name, signature, or initials. Sometimes inmates will use interview/information request forms instead of HSR forms. In those cases, HSU processes interview/information requests in the same way they would process HSRs.

If the triaging nurse determines that a patient's medical need requires further evaluation, an appointment is almost always set with a member of the nursing staff before any referral to an ACP. However, neither HSM Barker nor Warden Buesgen instituted an express policy that inmates could not receive *any* care until they were seen by a physician. Instead, as a matter of HSU practice, nursing staff evaluates the patient to determine whether the patient requires further treatment beyond what the nursing staff has the authority or capability to provide. Then, if necessary, a nurse refers the patient to a physician or another ACP.

Referrals for ACP appointments are sent to a scheduling queue, and the institution's Medical Program Assistant Advanced ("MPAA") is responsible for reviewing orders and scheduling inmate patients for appointments with ACPs. If a nurse or any other HSU staff believes that a patient should be seen sooner, they can discuss it with the provider. ACP appointments are posted daily in HSU, and inmate patients are responsible for checking the postings for appointment times. If there are special instructions specific to a patient's appointment, the patient will receive a separate sheet from medical staff.

### C. Medications for Inmates

DAI Policy 500.80.04, entitled "Over the Counter Medications," governs how inmates may obtain these medications through the canteen or the HSU. It also directs HSU to provide over-the-counter medications after an assessment and when determined medically necessary. Both this policy and federal regulations limit nursing staff to providing inmates over-the-counter medication because they do not have the same education and training as ACPs, who are allowed to prescribe other medications. However, ACPs generally do not prescribe medications for inmate patients without first evaluating them, as doing so is contrary to prescribing laws and not the best practice.

### D. Plaintiff's Symptoms and Treatment by Nursing Staff

Plaintiff has a documented history of internal hemorrhoids dating back to at least October 2021.[4] On August 1, 2022, plaintiff discovered blood in his stool and was having

---

[4] According to Barker's uncontradicted declaration, hemorrhoids are" vascular-rich connective tissue cushions located within the anal canal." Internal hemorrhoids lie proximal to the dentate line, which divides the anal canal into upper and lower segments in the anal canal. Hemorrhoids

pain, so he began using Preparation H ointment to treat these symptoms. On August 6, 2022, plaintiff wrote to HSU, asking to be seen because he was still in pain even after using hemorrhoid ointment. Plaintiff was scheduled for a nursing sick call visit the following day. On August 7, 2022, he saw Nurse Leahanna Krizan, who noted that plaintiff reported having pain on a scale of 3 out of 10, experiencing burning when he applied his hemorrhoid cream, and obtaining some relief by using a cool compress. Non-defendant Nurses Krizan and Hoyt both assessed plaintiff's anus, noting an external hemorrhoid but no redness, drainage, or signs or symptoms of infection.[5] Accordingly, they advised plaintiff to continue using a cool compress, try cream for a couple of days, and write back if his symptoms persisted. These nurses did not schedule an appointment with an ACP or tell plaintiff that he had to be evaluated by an ACP to receive further treatment.

On August 9, 2022, plaintiff submitted another HSR, asking to be seen because the hemorrhoid ointment did not have any effect. He made a similar report to his unit manager around August 10, 2022. An HSU triage nurse, non-defendant Miranda Peterlik, responded on August 11, 2022, by advising plaintiff that he had been added to the physician appointment list and submitting an order for a referral to a provider for a

---

are a normal anatomic and functional component of the anal canal; they become pathologic and are termed hemorrhoidal disease only when they cause symptoms. As the patient strains at stool, the hemorrhoids are pulled lower into the anal canal, and as the vascular cushions engorge, the thin epithelial lining is easily torn, which causes bleeding. If the patient presents with mild intermittent bleeding, diet and lifestyle modifications to prevent constipation are usually all that are required to treat the hemorrhoids.

[5] Plaintiff claims that *he* felt swelling, pain, and drainage at this time, and he further claims that he had an anal fissure, but he does not indicate how he knew a fissure existed before being diagnosed with it at a later appointment on September 2, 2022.

hemorrhoid evaluation. The MPAA then scheduled plaintiff's appointment for this condition for September 2, 2022.

Plaintiff also had an annual health maintenance appointment scheduled with a doctor for August 12, 2022, but that appointment was cancelled. Therefore, plaintiff wrote to HSU on August 14, 2022, complaining that he had not been seen on August 12 as originally scheduled. On August 16, HSU responded that he would be seen in about two weeks for an annual health maintenance appointment, which was scheduled for and conducted on August 30. Also on August 16, plaintiff submitted another HSR requesting to be seen, and the triaging nurse responded that he had an upcoming appointment with the institution physician.

On August 25, 2022, plaintiff again wrote HSU to inquire about his being seen by a doctor. Plaintiff was then scheduled for a nursing sick call visit on August 26, at which he saw Nurse Peterlik, who told plaintiff to continue to use topical cream to help with pain until he could be seen by the doctor as scheduled for the following week. Nurse Peterlik also entered an order approved by Dr. Filipescu for dibucaine 1% topical ointment to be used as necessary for hemorrhoids.[6]

On August 27, 2022, plaintiff submitted an HSR complaining that none of the treatment options for his hemorrhoids had relieved his pain, including applying dibucaine ointment and hemorrhoid cream or drinking polyethylene glycol. The triaging nurse

---

[6] This ointment is used to decrease pain and itching from skin conditions or hemorrhoids. Peterlik was not authorized to order this prescription medication without prior approval from the institution's physician.

9

responded that plaintiff had an appointment with the institution physician on September 8, 2022, although that date is not noted in plaintiff's records, which show the appointment was actually set for September 2.[7]

On August 29, 2022, plaintiff submitted two HSRs complaining that he was still in pain, his condition was not improving, and he wanted to see the institution physician, who was apparently onsite that day. However, the triaging nurse responded that he had already been assessed by nursing staff on August 7 and August 26, and was on the list for an appointment with the institution physician. According to HSM Barker, however, plaintiff's appointment with the physician was neither expedited nor considered an emergency because: plaintiff had only first complained of hemorrhoid pain in early August 2022; his complaints remained the same with no report of increased pain or discomfort; he had already been evaluated twice by nursing staff; and he was receiving treatment for his pain.

On August 30, 2022, plaintiff submitted two interview/information request forms to Barker's attention, writing in one that he needed to be seen sooner than September 8, and in the other that even though he had an August 12 appointment for his hemorrhoids, his pain resulted from swelling and not hemorrhoids. On August 31, 2022, Nurse Hoyt responded on Barker's behalf that: she had ordered plaintiff witch hazel topical pads to relieve his discomfort and burning; plaintiff should use a pillow or blanket for comfort and

---

[7] Plaintiff avers that the appointment was moved from September 8 to September 2, because his family had called HSU. While defendants dispute that the appointment was expedited due to plaintiff's complaints, Nurse Hoyt's September 6 response to a later information/interview request states "your doctor appointment was expedited." (Dkt. #94-1, at 27.) Ultimately, this dispute is not material to plaintiff's Eighth Amendment claims for reasons explained in the opinion below.

take Tylenol or ibuprofen for pain; and plaintiff had received all available treatment that nursing staff could provide until he could be seen by the institution physician. Because Nurse Hoyt had the authority to respond to and triage plaintiff's requests, however, she did not forward either request to Barker for further review.

Plaintiff submitted yet another interview/information request to Barker's attention on August 31, 2022, stating that the witch hazel pads were also ineffective and again asking to see the institution physician. Once again, Nurse Hoyt responded on Barker's behalf, reminding plaintiff that he had an appointment to be seen by the physician, which the electronic medical record showed was scheduled for September 2, 2022. In response to a later interview/information request in which plaintiff complained about the delay in treatment, Hoyt also wrote on September 6, 2022, reiterating that plaintiff had received all of the care allowable by nursing staff while he waited for his doctor's appointment, including appointments with nursing staff, over-the counter medications, and an expedited physician appointment.

As scheduled, Dr. Filipescu saw plaintiff for complaints of hemorrhoid irritation and pain on September 2, 2022. At that time, he noted a skin tag at the top of plaintiff's anus and a shallow anal fissure, which is a small tear in the lining of the anus that can cause pain and bleeding. Dr. Filipescu prescribed nitroglycerin ointment .4% to be applied twice daily, docusate (a stool softener), and psyllium (a type of fiber). Unfortunately, plaintiff had an adverse reaction to the nitroglycerin after he applied it for the first time on September 7, 2022, so that medication was discontinued. Plaintiff's medical record shows

that he saw a physician outside the institution on November 28, 2022, and was advised to use sitz baths to relieve his rectal discomfort and pain.  (*See* dkt. #94-1, at 7-8 and 19.)

## OPINION

### I.  Discovery-Related Motions

After the completion of briefing on defendants' motions for summary judgment, plaintiff filed what he entitled a motion for default judgment, which the court construed as a motion to compel defendants' responses to certain interrogatories and requests for admission, as well as a motion to compel discovery primarily related to Dr. Filipescu's prescribing of nitroglycerin ointment.  Because the court is dismissing plaintiff's medical negligence claim, plaintiff's motions to compel discovery from Dr. Filipescu in particular, as well as to compel discovery from any defendant about his prescribing nitroglycerin ointment, will be denied as moot.

With respect to DOC defendants Buesgen and Barker, plaintiff argues that they refused to answer several interrogatories and requests for admission generally related to the classification of inmate medical conditions -- including his -- as emergency, urgent, and non-urgent; procedures related to evaluating inmate patients and prescribing medications; how staff evaluated and treated plaintiff's symptoms without a diagnosis from a doctor; defendants' communications with plaintiff and his family; and Barker's supervision of HSU staff.  (*See* dkt. #128, at 3-5.)  However, those defendants have submitted evidence that they previously responded to all of plaintiff's formal discovery requests, which sought similar information, and that plaintiff impermissibly requested additional information for

the first time in his motion to compel, without ever including them as the subject of proper discovery requests under Federal Rule of Civil Procedure 37.

While plaintiff may now be trying to challenge defendants' related relevancy and vagueness objections to earlier discovery requests, he has not identified which specific objections he believes were improper, with the exception of one interrogatory asking "if a serious problem [exists] with the system, who is in charge or responsible to correct the problem or is it up to the physician or HSU?" (dkt. #141, at 3), which the court agrees is unartfully drafted at best, and vague at worst. Therefore, plaintiff's discovery motions will be denied. Even if plaintiff were allowed to revise his discovery requests to comply with the deficiencies identified above, however, the state defendants' responses are not needed to resolve their motion for summary judgment because the proposed factual findings and declarations submitted in support of their motion (dkt. ##94-95) respond to plaintiff's interrogatories and requests for admission in all relevant respects.

## II. Motion for Summary Judgment

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, the burden shifts to the non-moving party to provide some evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court not only views all facts and draws all inferences in the light most favorable to the nonmoving

13

party, *Anderson*, 477 U.S. at 255, but construes the filings of unrepresented parties like plaintiff generously, *see Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

Still, summary judgment has been repeatedly referred to as the "put up or shut up" moment for parties seeking to take their claims to trial, at least in the Seventh Circuit. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts"; he must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish a genuine triable issue. *Anderson*, 477 U.S. at 256-57, 261. Moreover, because those facts must be admissible at trial, plaintiff may not rely on inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Finally, a factual dispute can preclude summary judgment only if the facts "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Based on the undisputed facts, defendants Buesgen and Barker seek summary judgment on four grounds: (1) plaintiff's condition was not objectively serious; (2) there was no prison or HSU policy resulting in a delay in the treatment of plaintiff's hemorrhoid condition in this case; (3) Buesgen and Barker were neither personally aware of such a policy nor that plaintiff had a serious medical need to which they were deliberately indifferent; and (4) defendants are entitled to qualified immunity. After making every effort to review plaintiff's pleadings, briefs, and the evidence of record in the light most

14

favorable to him, the court finds that defendants Buesgen and Barker are entitled to summary judgment on the Eighth Amendment claims asserted against them. In particular, plaintiff has *not* demonstrated that a reasonable jury could hold either responsible for any policy that delayed his receipt of necessary medical treatment for his pain. Because the court must dismiss these federal claims, it will also decline to exercise supplemental jurisdiction over plaintiff's remaining state law claim for medical negligence against defendant Filipescu and remand that claim to the state court for resolution.

### A. Eighth Amendment

The Eighth Amendment's prohibition on cruel and unusual punishment prohibits prison officials from acting with "deliberate indifference" to "substantial risk of serious harm" to a prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). As applied here, the Eighth Amendment prohibits prison officials from acting with deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a medical deliberate indifference claim, a prisoner must demonstrate both of the following elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent to that need. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). However, the condition does not have to be life threatening, *id.*; rather, a medical need may be "serious" if it causes significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996), or otherwise subjects the prisoner to

a substantial risk of serious harm, *Farmer*, 511 U.S. at 825. "Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but they are disregarding the risk by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

Because defendants have raised a qualified immunity defense, plaintiff must also show that defendants violated clearly established law, which means that the law was sufficiently established at the time of the alleged violation that every reasonable official would understand what he or she was doing is unconstitutional. *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023). Plaintiff can prove this in one of three ways: (1) point to a closely analogous, binding case that established a right to be free from the type of action the defendants performed; (2) identify a clear trend in the case law showing that the recognition of the right by controlling precedent is merely a question of time; or (3) show that the defendant's conduct was "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620-21 (7th Cir. 2022) (citations omitted).

Plaintiff has presented some evidence that he had an objectively serious medical condition, as he sought and received treatment for ongoing rectal pain in August 2022. While the undisputed evidence shows that plaintiff was seen twice by nursing staff in August 2022, and received various over-the counter medications and recommendations, plaintiff argues that this treatment was ineffective and that he did not receive the diagnosis and treatment he needed because he was not allowed to see a doctor until September 2, 2022. However, to prevail on an Eighth Amendment claim against HSM Barker and

Warden Buesgen, plaintiff must prove that they each personally knew he needed treatment but consciously failed to take reasonable measures to ensure that he received it.  Here, the evidence fails to support a reasonable jury finding that either Buesgen or Barker were *personally* aware plaintiff needed any treatment, let alone that they *knew* the evaluation and treatment provided by nursing staff would be ineffective.  Moreover, neither of these defendants can be held liable simply because they hold high-level administrative positions. *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) ("[A] § 1983 plaintiff may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution.").

Nevertheless, plaintiff contends that a reasonable jury could infer HSM Barker must have been aware of what was going on, and to support this contention, he has submitted a series of emails in which Warden Buesgens's office, Barker, and others discuss plaintiff not receiving adequate medical treatment for hemorrhoids.  However, these emails are all dated on or after August 30, 2022, and fail to show that the warden had received any correspondence from plaintiff before receiving telephone calls from plaintiff's family member and a lawyer on August 30.  (*See* dkt. #115-1.)  Therefore, a jury could not reasonably conclude from this evidence that Buesgen and Barker acted with deliberate indifference to plaintiff's alleged lack of effective treatment after learning about it.  If anything, plaintiff actually being seen by a physician only *three days* after either was made aware of plaintiff's ongoing pain, despite already being seen twice by nursing staff, would appear to demonstrate the opposite.

Similarly, there is no evidence that Warden Buesgen or HSM Barker were responsible for any policy preventing plaintiff and other inmates from receiving reasonable treatment in a timely manner. The only HSU or BHS policies even discussed by the parties are (1) the DOC medical triage procedures used at Stanley to respond to inmate HSRs and (2) the state and federal requirements that limit medication prescribing authority to ACPs.[8] However, there is nothing inherently or obviously unreasonable about either of these policies, which are necessarily used to manage health care both in and outside of prisons. In any event, it is undisputed that neither Buesgen nor Barker have the authority to create or change department, state, and federal requirements mandating the prescriptive authority of nurses. Further, even though nurses cannot provide inmates with prescription medications without a doctor's order, they are able to provide a wide variety of assessment and treatment, and seek prescription medications form an ACP, as was the situation in this case.

Ultimately, the undisputed record also shows that there was only a 26-day span between plaintiff's first HSR regarding hemorrhoidal pain on August 7, 2022, and his appointment with Dr. Filipescu on September 2, 2022. While plaintiff argues that he first asked for Preparation H on July 31, 2022, this additional week is not material.[9] Moreover,

---

[8] Although plaintiff suggests that HSU's alleged practice of operating without a physician onsite unnecessarily delays inmate care, he has failed to adduce any evidence that a systemic deficiency adversely affects inmates on a widespread basis. *See Alexander v. Richter*, No. 15-cv-766-wmc, 2017 WL 5634132, at *5 (W.D. Wis. Nov. 22, 2017), *aff'd*, 756 F. App'x 611 (7th Cir. 2018) ("[T]he Seventh Circuit has rejected claims of systematic deficiencies where an inmate only presents evidence of his own or a few others' medical care and fails to submit evidence showing that the practices he complains about have adversely affected a wider group of inmates as well.").

[9] Equally insignificant is the dispute over the original date of the physician's appointment, which was either September 2, or six days later, on September 8, 2022.

during this approximately one-month period, Stanley's nursing staff responded to *all* of plaintiff's HSRs in a timely manner, evaluated him twice for his complaints, and provided plaintiff with various over-the counter medications and, with approval of Dr. Filipescu, a prescription ointment, as well as multiple other comfort recommendations. While plaintiff says that none of these measures worked and left him in pain for a month, he has not submitted any evidence apart from his own, lay opinion from which a reasonable jury could find that either his hemorrhoids or his later development of an anal fissure posed a dangerous or harmful condition requiring immediate or emergency care.

To the contrary, even when Dr. Filipescu examined plaintiff on September 2, 2022, he did not note an urgent condition requiring emergency care, and there is no evidence that plaintiff ever required an emergency intervention. Moreover, although plaintiff saw an outside provider on November 28, 2022, there are also no additional rectal conditions or diagnoses noted in the medical record cited by plaintiff than those found by Stanley's medical staff, with the only recommended, additional treatment appearing to be sitz baths. While plaintiff may believe that he should have received a different course of treatment, he fails to identify what that treatment should have been. Even if there was an alternative treatment that plaintiff preferred, HSU's failure to provide him with his desired treatment does not constitute a constitutional violation. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (disagreement between prisoner and his provider, or even between two medical professionals, about proper course of treatment is insufficient by itself to establish Eighth Amendment violation); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmates are not entitled to demand specific medical care).

19

Neither has plaintiff pointed to nor the court found, any clearly established law stating that an inmate presenting with rectal pain must be immediately seen by a physician, even though nursing staff triaged his complaints and provided him with evaluation and care within 24 to 48 hours. Instead, the Seventh Circuit has held that "isolated delays" of one to two weeks in the treatment of an *infected* gluteal cyst, "taken alone or collectively, cannot support a finding of deliberate indifference" when the "totality of an inmate's care" showed he had received some treatment on nine occasions over 10-month period, including pain medication, sitz baths, and antibiotics. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Thus, while plaintiff contends that the nursing care he received was ineffective, he has failed to show that it was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate [his] condition," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or so egregious that "no reasonable official could have thought he was acting lawfully," *Stockton*, 44 F.4th at 620-21. For all these reasons, defendants Buesgen and Barker are entitled to summary judgment on plaintiff's Eighth Amendment claims.

## B. Medical Malpractice

Finally, plaintiff asserts a claim for medical negligence under Wisconsin law against defendant Filipescu and seeks leave to amend his complaint to add new theories of negligence against all three defendants. If related to a federal claim in the same action, this court would have supplemental jurisdiction over these state law claims under 28 U.S.C. § 1367(a). However, the court has dismissed all of plaintiff's federal claims, and plaintiff does not allege any other basis for federal jurisdiction over the state-law claims than the constitutional claims now rejected. Absent unusual circumstances, district courts must

20

relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Here, neither party identifies any unusual circumstances that would justify retaining jurisdiction over plaintiff's current state-law claim, which must be evaluated under completely different state law standards of medical negligence, or exercising jurisdiction over his newly proposed, state-law negligence claims. Accordingly, the court declines to exercise any further jurisdiction over the medical negligence claim and will remand it to the Circuit Court for Dane County, Wisconsin, for resolution. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 641 (2009) ("When a district court remands claims to a state court after declining to exercise supplemental jurisdiction, the remand order is not based on a lack of subject-matter jurisdiction for purposes of §§ 1447(c) and (d)."). Additionally, plaintiff will be denied leave to amend his complaint to add additional negligence claims against defendants because any such amendments would be futile in light of the court's rulings. *See Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009) ("courts have broad discretion to deny leave to amend where . . . the amendment would be futile").

ORDER

IT IS ORDERED that:

1) Plaintiff David Marshall's motion for default judgment (dkt. #128), motion to dismiss for failure to meet the court's filing deadlines (dkt. #131), motion to compel (dkt. #141), renewed motion for court assistance in recruiting counsel

to represent him at trial (dkt. #143), and motion for leave to amend his complaint (dkt. #145) are DENIED.

2) Defendants Chris Buesgen's and Jamie Barker's motion to correct their reply brief (dkt. #126) is GRANTED.

3) The motion for summary judgment filed by defendants Buesgen and Barker (dkt. #91) is GRANTED.

4) Plaintiff's state law claim against defendant Radu Filipescu is REMANDED under 28 U.S.C. § 1367(c)(3), to the Circuit Court for Dane County, Wisconsin for resolution.

5) Defendant Filipescu's motion for summary judgment (dkt. #74) is DENIED as moot.

6) The clerk of court is directed to enter final judgment and close this case.

Entered this 13th day of August, 2025.

BY THE COURT:

/s/
_____

WILLIAM M. CONLEY
District Judge

22